Thank you, Your Honor. Good morning. If it pleases the Court, my name is Rick Ramler and I'm here on behalf of the appellants, Mr. and Mrs. Barber. Today this Court considers whether the release that was signed by Mr. and Mrs. Barber in 2002 should be interpreted to grant the defendants a license to defame the defendant's perpetuity. We urge the Court to reject this interpretation for two reasons. First, this action, this defamation action, does not grow out of the wrongful death action and because it does not have the same legal and factual issues are involved in this defamation action as are involved in the wrongful death action. I have trouble understanding that. It's a very sad case and it's certainly a sympathetic case, but I can't see why it's not exactly the same thing as occurred before the release was signed, just another instance of it. And I think the brief, in fact, makes that point that it's another instance. Now, if it were a release for a car accident, you had a car accident with me January 1, you drove negligently and injured me for release of all claims from the beginning of time to the present day, known or unknown, standard form release. And then there was another car accident the following year, same people, and that would not be released because it really is a new car accident. But here it looks like it's the same thing. Before the release is signed, the Barbers say it's a defective firearm because it can fire without the trigger being pulled. And Remington says we couldn't get it to fire without the trigger being pulled. And what's more, there was rust and poor maintenance on the gun. And some, I can't remember if they said there was a modification. Then there's a release. And subsequent to the release, Mr. Barber is promoting his view that something ought to be done about the gun because it has a defective design. And Remington is saying the same thing. We couldn't replicate the accident. I can't see why it doesn't fall within that common nexus and grow out of phrasing that our cases apply. Well, there are several reasons, Your Honor. The issues in the wrongful death action center on events that occurred on October 23, 2010, or 2000. And those issues are, was the Barber rifle defective? If so, did the defect cause Gus Barber's death? You're talking about now the pre-release period? Yes. And if so, what were the damages resulting from Gus Barber's death? The issues involved in this defamation action center on statements that were made by the defendants beginning in 2010. Well, weren't similar statements made by defendants prior to the release? There were statements made by the defendant about the condition of the Barber, the condition and testing of the Barber rifle. That's what I meant. There were. But there are two factual issues here that are the subject to this defamation claim. One is the condition and testing of the Barber rifle. And the second is whether it is possible for these rifles, not just the Barber rifle, but for these rifles, these model 700 rifles, to fire without a trigger pull that has, for reasons that have nothing to do with improper maintenance. I understand that. But weren't the same statements made before the release was signed? And the release applies to all claims that were or could have been made? Just your standard form, broad release. There's several issues involved in that. And the issues concerning the possibility of these rifles firing without a trigger pull was the message of Mr. Barber and was the message of the CNBC show, Remington Under Fire. It was not just the condition and testing of the Barber rifle. That wasn't reported in the CNBC show. What the CNBC show had to do with was whether or not it's possible for these rifles to fire without a trigger pull. Remington's statements were made in response to that. Their message in their statements is that it is impossible for these rifles to fire unless they're improperly maintained or improperly adjusted. Mr. Barber became a public safety advocate and an expert on this issue in Remington's internal documents after the release was signed. He did it through years of investigation, years of discovery, and he's become a nationally known, nationally recognized public safety advocate on this issue and on Remington's internal documents. In Remington's response, they talked about the condition and testing of the Barber rifle, not to relitigate that wrongful discharge case or wrongful death case. Well, they're not relitigating the wrongful death case, no question about that, but because the claim applies to or the release applies to all claims that could have been made, that means that even though they were just litigating a wrongful death claim at the time, if they could have made a defamation claim at the time, that was also released. I don't know that they could have made a defamation case at that time. You can't see the material difference because Remington's defense of its firearm was materially similar. One of the issues in a defamation case is whether or not it's had a defamatory effect on the Barbers. The defamatory, there's also an issue when you're in litigation or in pre-litigation, whether or not statements are conditionally privileged, and there's an issue about that. That privilege does not extend to this response. That's true, but you've got a different problem now, and that is that Mr. Barber's made himself a public figure. He has, and we acknowledge that, and he'll need to prove actual malice if this case is allowed to proceed. He is a limited-purpose public figure for this statute. Counsel, I have a question for you, if I may. Traditionally, every time someone utters a defamation, it's a different tort, and so in that sense at least, Mr. Barber could not back in the early part of the 21st century, first couple of years, what was it, 2002, when he signed the release, he could not at that time, or when he brought his complaint, have sued for a defamation on the 2010 statements because they hadn't been made. As one judge, I'm not troubled by Judge Kleinfeld's question implying that there's some sort of race judicata. However, the release says it covers any claim that grows out, that grew out of the incident, or some language to that effect, something like that. My questions are, first, why doesn't this defamation claim grow out of the first incident? That seemed to be what the district court thought. Second, if it does, is a release that would cover that invalid? The short answer to those questions, Your Honor, is we do not believe that these statements that were made in 2010 grow out of or rise out of the wrongful death action or the subject of that release. Yes, we do believe that Montana law is clear that you cannot contractually release a future tort. That was for things like where you went to the hospital for your emergency appendectomy and the doctor required you to sign a release of any claims for negligence before he took care of you? Correct. I didn't think they applied it. I thought they did not apply that rule to this sort of release. I'm sorry, Your Honor. This release happened after the event rather than like the doctor at the hospital with the appendectomy where it's before the event of negligence. I'm sorry, Your Honor. I don't understand the question. I think Judge Kleinfeld is saying this release was after the first shooting incident. It was. It gave rise to the claim and as opposed to a release like at a hospital. That occurred before the claim. Before the negligence. You're talking about 28-2702, I think. Yes, Your Honor. The exemption from responsibility contracts that have for their object directly or indirectly to exempt anyone from responsibility for their own fraud and so forth. Is that right? Yes, Your Honor. But this tort had already occurred and that's I think what Judge Gould's getting at. Yeah, this court is centered on statements that were made after the release was signed and the effects that those statements have had on Mr. and Mrs. Barber. Well, if Remington wanted to have a release that would settle everything that had been alleged or could be alleged and if Judge Gould is correct that any future repetition would be yet another defamation. What language would they have included in this release in order to effectuate that agreement? Under Montana law and under the McDermott, Miller, and Spaff cases, it is not permissible to release future torts. Remington's free to tell the truth. Well, isn't that the question then about whether this was a future tort? I don't mean to beat around the bush. I'm troubled by the statement on page four of the reply brief that says that the Barbers are requesting a judicial determination of who is telling the truth and who is not. And these allegations, getting back to Judge Klinefeld's point, these allegations about whether, as you said, the two issues, one is contesting the condition of the Barber rifle and the second is whether this type of rifle was whether it was possible to fire without a trigger pull. So if you're requesting a determination about the truth of those two issues, isn't that exactly the claim that was released? No, we don't believe so, Your Honor. The reason that they made the statements in 2010 concerning the Barbers, the condition and testing of the Barber rifle, was to undercut Mr. Barber's credibility, to attack his truthfulness and his credibility when he speaks publicly about the condition of all of these rifles. There's certainly an ongoing controversy about this product. Yes. And I think Remington lawyers are going to stand up and say that they were defending their product as opposed to attacking your client. And that may be just a matter of the lens through which they're viewing those statements. But I struggle to see what language they would have included, what is missing from this release. I don't think that you can. I think that this is a new tort. It did not exist. These statements were not made. And I don't think it's permissible under Montana law to do that. Okay, so just help me out with that. Why is this a new tort? If they had said something really reprehensible and outrageous, like, and forgiveness is, of course, only a hypothetical. If they had accused a family member of killing this child in the wake of this horrible tragedy, maybe that would be a different tort, a qualitatively different statement. But here, the statements in the Remington release and response, I guess there are two responses, really strike me as going to the product defect issue, the nature of this product. So I'd like you to tell me why I'm wrong. The reason, first of all, I think the reason that Remington made these statements about the Barber rifle in 2010 in response to the CNBC show was to undercut Mr. Barber's credibility. That was not why they made the statements in 2001. Mr. Barber was not a public safety advocate at that time. So this issue, these statements, Remington's response was to this entire issue, to this issue of whether or not it's possible for these rifles to fire without a trigger pull. They attack Mr. Barber the same way you attack, a trial lawyer attacks an expert witness. They attack their credibility to undercut their message, to undercut the public's trust in what they're saying. And that's exactly what Remington did here. That did not occur in 2001. And that was not the reason for those messages there. Mr. Tamler, let me, I have one other question that hasn't come up, and I don't think it's raised in the briefing, but I'd like your thought on it. Has the Montana Supreme Court ever issued a ruling that has held that a release executed? In, you know, year X, let's say, year 2002, cannot release events that occur in year X plus eight, year 2010. Now, I mean, have they, have they ever addressed that issue? Or either have they said that you can release that or that you can't? They have never, Montana has been, the Montana Supreme Court has been steadfast in holding that you cannot release a tort that does not exist. There is no case law in Montana that's authorized that. Okay, so could this issue be certified to the Montana Supreme Court? Or is it your view that their prior precedent is so clear that it would not consider deciding the issue? If this court feels certainly it could certify that question to the Supreme Court. We, we think the answer to that is clear, Your Honor, by, by reading the cases. Definitely your briefs, but it's also clear that the panel doesn't think it's clear. I understand that, Your Honor. Your time's run out. May I ask one more question? Yeah, go ahead, Judge Kleinfeld. I guess we both do. The district judge saw a First Amendment issue lurking behind the tort and contract issues here, and that was that if you were to prevail at least on the question of law, then it would effectively impose a gag order on Remington so that Mr. Mr. Barber could go on television and gun magazines and other media and say Remington was a bad company that had made a defective firearm that could fire without having the we didn't and, and its own First Amendment right to speak on its own behalf as saying that they make sound firearms would be thwarted. Do you have any thoughts on that? I do, Your Honor. I, I, uh, there's a, there's a case in Montana that, um, talks about the interplay between the First Amendment and, uh, opinion statements and, and, uh, the implication of factual statements. And that's Hale v. City of Billings. It's 1-999-MT-213. And, um. Counsel, could you give me the citation again? I wrote down too many nines, I think. It's 1999. Okay, thank you. Hale. Hale, H-A-L-E v. City of Billings. Thank you. And, uh, Remington is, is, is free to express an opinion. They are not free to imply facts that are not true or to state facts that are not true. And that is what they've done in this case. Um, the statements, the, the false statements that they're making are not true. The underlying factual statement is, is it possible for these rifles to fire without a trigger pull? It, the opinion is whether or not it's defective. The truth, and, and the truth of the fact, and which can be proven, and which has been clearly alleged in the complaint, the amended complaint, is, is that Remington's own documents prove that these, these rifles fire without a trigger pull for reasons other than improper maintenance or improper adjustment. The other, and just once again, the other. There's never been an adjudication of that because the tortsuit was settled, isn't that right? The cases are typically settled and they're typically sealed. So, so there's never been an adjudication that the firearm can fire without the trigger being pulled. You take the position that it can be, and that you think you can prove it, and they take the position that it can't be, and they think they can prove it. That's correct. Isn't that the current state of affairs? That's correct. There, there have been cases, Your Honor, personal injury cases where the juries have found that these rifles have a design defect, and there have been cases dependent on the facts of the particular incident. So there has been an adjudication? There's, there. Of the defect, is that right? In at least one case in Texas, there was a decision in a personal injury action that these, that these firearms were defectively designed. But when, when going back, I don't want to get you away from Judge Kleinfeld's question, but going back to this statement in your reply brief, you seek a judicial determination of who is telling the truth and who is not. So are you seeking another judicial determination of that fact? Is that what you're saying? We're not seeking a determination of what's defective. We're seeking a determination of who's telling the truth. What they have done here . . . About, about, about what? Who's telling the truth about whether this rifle can shoot without a trigger pull? Yes. Okay, thank you. And . . . But that gets back to Judge Christian's question a few minutes ago, where she asked you, wouldn't that determination involve litigating the defense of truth that was part of what was settled in the release of the personal injury claim? That truth was not settled. Sure, it was settled. That . . . It was released. It was a claim. And the claim was that the firearm could fire without the trigger being pulled. It was in dispute. And it was never adjudicated because of a settlement and release. It would have to be adjudicated in order to determine whether Remington's statement that can fire without the trigger, or cannot fire without the trigger being pulled, is true. Because if it's true, what Remington says, then they have a defense in the defamation case. The resolution agreement released Remington from future liability for damages resulting from the death of Gus Barber. There was no acknowledgement of . . . That was much broader. It said all damages of any kind for anything whatsoever, which the plaintiffs may now have, or may hear after, accrue, or may in any way grow out of the accident, and so forth. I understand that, Your Honor. But respectfully, there was no agreement as to whether or not these rifles were defective. The Barbers did not agree . . . No, you didn't have to agree on whether they were defective. They didn't. Gus Remington agreed to pay the money without a determination, and the plaintiffs agreed to dismiss and forever discharge and release all claims of any kind that arose out of their claim that it was defective. And that had to do with that incident. Again, Your Honor, the reason for these statements is to undercut Mr. Barber. Well, there's never been another incident. There was never another time when the same firearm fired without a trigger pull and hurt somebody. Not with the Barbers, Your Honor. But this defamation action involves statements, and whether those statements are true, and whether they've defamed the Barbers. And this case did not exist in 2002 when the release was signed. I think we understand that argument. Let me say, Judge Kristin had a question. It's been answered. Thank you.  Thank you, Your Honor. Well, you've used eight minutes more than your time, but we'll still give you a minute or two on rebuttal. Thank you, Your Honor. Hear what you have to say about Remington's argument. And as for Remington's counsel, we'll give you all the extra time that you need here to cover all the issues. May it please the court, my name is James Votes. I represent the defendants in this case. The district court, Judge Christensen, got it right. The resolution agreement and the release forever discharged not only all existing claims, but all future claims, regardless of when they . . . I know some hospitals and some doctors, before they will treat you, require you to sign a release, releasing the negligence that they may engage in during the treatment or procedure or surgery they propose to give you. And they just don't take care of you until you do that. You want . . . And as I understand this, 28-2702, that says that the patient can sign that with impunity because it won't affect his tort claim. I don't know if I'm understanding it right. And I don't know how the Montana courts have interpreted it. I do know that the release here purports to release future claims that may hereafter accrue. And that's why 28-2702 becomes relevant. Could you tell us what the Montana interpretations have been of 28-2702? Well, I think the statute is plain on its face that pre-tort releases are not valid in Montana. What we have here, however, is not a pre-tort release. It's a release of a tort that applies to future . . . It's not that simple. The law is that if you defame somebody in January, you settle, and then you defame them again in May, it's a new tort. Well, it depends on the language of the release regarding that initial tort of defamation. So is it really your position that if Remington had said something, as in my earlier hypothetical, something really reprehensible, accused, for example, a family member of killing this child, your position is that that would have been released? No, Your Honor. If, in fact, a statement like that was made that accused Barbara . . . That'd be a new tort, wouldn't it? Yes, because it doesn't grow out of the accident. An accusation that Barbara murdered her child, killed him intentionally . . . Some horrible thing like that. Something horrible like that would not grow out of the accident. By its nature, an accident is just that. It's not an intentional act. That would be outside of the scope of this release. This gets back to Judge Kleinfeld's question. Your initial statement, your opening statement, was quite broad. You said the district court got it right. Any tort that arose out of this accident was forever released. It's a future tort. But doesn't this case require us to decide whether this is really a future tort? I think it requires you to interpret the language of the release and decide whether this is a future claim accruing after the alleged tort resulting in the accident occurred. And that's what the scope of the release agreed to by the parties intended to accomplish. So the district court didn't draw that line for us. And maybe this case doesn't require that we draw that line. But if we decide that it does require that line drawing to be done, I think the argument up to now has indicated that the Montana Supreme Court hasn't drawn it yet, hasn't decided. We really had to put a fine point on what constitutes a future tort in a case like this. Well, I'm not aware of any case that's come before a Montana court on this subject because this type of release is routinely used by parties to settle lawsuits, not only in Montana, but around the country. But you see why it would be problematic when applied to a tort like this, a defamation claim, for the reason Judge Gould indicated. A new statement could be a new defamation depending on the statement. It would depend on the statement here. And if that statement did not grow out of the subject matter released in the early release, that might be a question in another case. But I think in this case, the scope of the release, the nature of the 2010 statements, which were merely repeating statements that had been made in 2001 that related solely to the condition of the firearm as it was discovered in 2001, the function of the firearm as it was discovered in 2001, plainly applied or within the scope of the accident. And that is the fundamental, I guess, definition of the scope of that release that the parties agreed to. This is a tricky set of questions, for me at least. Let me ask you the same question I asked the panel. Is there any Montana Supreme Court case that has said that a release entered in year X, which here says 2002, can release with broad language a tort that occurs in year X plus 8, which is here 2010? I'm not aware of that case, Your Honor. But I am aware that Montana, like all states, do apply basic rules of contract construction to interpret releases. And under those basic rules of contract construction, I think this court could have confidence that the Montana Supreme Court would apply those rules and find that this release released future claims growing out of the accident. My question is just, has the state Supreme Court ever established a rule that covers my hypothetical? Yeah, and I'm not aware of that case, Your Honor. My second question is, should our court certify that? I don't think that's necessary, Your Honor, because again, basic rules of contract construction that have been codified in Montana could easily be applied by this court. And this court could predict that the Montana Supreme Court would follow those statutory rules of contract construction and apply them to this release. You know, finding that this release does not cover these kinds of after acquired or future claims, you know, would effectively render invalid any number of settlements that have been entered into over the years in Montana and elsewhere. And I just don't think that any court, whether it's the Montana Supreme Court or Supreme Court of any other state would have terrible difficulty finding that this kind of after acquired later accruing claim growing out of the subject matter release, the accident. And Mr. Ramler, I think, mischaracterized the release in some subtle but important way. The release just didn't release claims growing out of a wrongful death action. It released claims growing out of the accident. And that's an important distinction. And Remington's comments in response to the CNBC program were limited to comments regarding the rifle involved in the shooting, its condition, and its function. It was a proportionate response in response to the CNBC program and the accusations made by Mr. Barber and others on that program. You know, and Judge Christensen got something else right. And I believe Judge Kleinfeld alluded to it earlier. You know, he observed that any other conclusion would have theftically put a gag order on parties who settle cases. They couldn't talk about the case. They couldn't discuss their evidence, their claims, their defenses without fear of defamation. You know, and that's just not how, you know. Well, let me ask you this. I mean, we're not a common law court to make law for the country. And so we can't approach this case that way. We have to look at it in terms of Montana law. But if we were just making up law, wouldn't it be a rational approach to say that the release doesn't release a future event? But when you get to the future event, if Barber attacks and criticizes Remington, they have a privilege of response. They have a privilege to respond unless they act in bad faith. Remington certainly had a couple of privileges to respond to the CNBC program, one of which was, you know, a common law self-defense or reply privilege, which allows people to make relevant, proportionate responses to accusations made publicly. The other is the Montana statutory privilege, the fair and true report of a judicial proceeding privilege. And the plaintiffs in the district court, in their Rule 59e motion, acknowledged that statements made surrounding judicial proceedings are privileged. But they don't answer the question, because I don't believe they can, as to how a statement made in 2001 was privileged, but then somehow lost that privilege in 2010. Well, we've covered that, right? At some point, it becomes a new tort. You acknowledged as much. That's why it's not enough to say that it just arose out of, right? It's not that simple. At some point, it could become a future tort. I do dispute that, because I think it's more properly characterized. You didn't dispute it. I asked you a hypothetical about if they had made some horrible, totally hypothetical statement, that would be a different tort. You acknowledged as much. Yes, if it did not grow out of an accident, if it wasn't plainly in reference to the circumstances surrounding that accident. I think Judge Christian's question actually penetrated a little farther than that. I think Judge Christian's question was, suppose that in some circumstance, obviously not this one, Remington had said, we have discovered that the accident that was previously settled was actually not an accident at all. It was a murder. That would have been, I think, I think that's what Judge Christian had asked you, and you had said, well, that would be a new tort. Yeah, that's certainly a closer call than what we have in this case. The release doesn't encompass anything that Remington may have said about the barbers. What if they didn't say it was an intentional murder, but Remington just said it was grossly negligent of the family member holding the gun to discharge it? I think that would be encompassed by the release, because again, if those kind of statements were made, those were essentially the affirmative defense pleaded by Remington back in 2001, that there was contributory negligence on the part of the plaintiffs, that there was a misuse of the firearm. That would be Remington simply commenting on the prior lawsuit and its defenses and how the accident occurred. So I do think those kind of statements would be encompassed by this release. That kind of comment would have a privilege of response, but it would not be an absolute privilege as I understand it. It would be a qualified privilege, so that if Barber could show that Remington knew it was false, they weren't just trying to undercut Mr. Barber's credibility, as Appellant argued, that that would defeat such a privilege. But that privilege is only qualified in the sense that the report is not fair and true. And what Remington said in 2010 were statements regarding its defense of the lawsuit in 2001. And its defense of the lawsuit was that the plaintiffs misused the firearm and the plaintiffs were contributory negligent in some regard. So what Remington said in 2010 was a fair and true report of what they alleged as affirmative defenses in 2001. It was a fair and true report of what they discovered about the gun when they jointly examined the gun with plaintiffs and their experts in 2001. They jointly discovered the condition of the rifle. They jointly tested the gun and discovered- Let's remember, we don't know what's true. It's never been adjudicated. Well, but it is. This doesn't have to be adjudicated, because what we have here are pleadings in the record from 2001 that reflect the affirmative defenses raised by Remington. And all Remington said in 2010 was essentially, we've raised those defenses based upon- There's never been an adjudication of whether the gun really did go off without the trigger being pulled, or whether the gun was improperly maintained or rusty. No, because that dispute settled, as you pointed out earlier. That dispute was resolved by the parties. And in the agreement itself, the parties understood and agreed that the resolution was a compromise of the dispute claim. My inclination, as I listen to your responses to other judges' arguments, is that much of what you're saying is a matter of degree and not kind, and I'm not clear on how to draw the line. For example, in Judge Christian's hypothetical, and what if Remington accused the publicist, or didn't accuse the publicist, but claimed that an incident that underlie some other dispute, obviously not this one, was a murder and not an accident. And you said that would be new. On the other hand, it is an explanation of something old, the event of the shooting. And now, in your answer that you just made, it's really the same thing. You know, if Remington undermined the credibility of somebody who is criticizing its products by saying the accuser is, oh, some sort of criminal, a drug dealer, or a child molester, looks at child pornography, all the things that we get a regular diet of here, and that would undermine the person's public standing to make criticism, but it would obviously still grow out of the old and longstanding publicity battle. What is the rule or principle for deciding what's a new tort that can't be released in advance, and what's an old tort that was released by the broad language of the release? Well, I think the court needs to come back to the fact that these parties are in a contractual relationship today. And that contractual relationship began in 2002. And everything that they have to say to one another or to the public is defined by the obligations in that contract. So far, that's a general and probably indisputable argument as far as it goes, but it doesn't go far enough to answer my question. Well, Your Honor, I think it goes far enough in the context of this case. Obviously, in the realm of hypotheticals, there are differences in degree and kind. But in the context of this case and the statements that Remington actually made regarding the accident gun and the accident resulting in the death of the plaintiff's son, I don't think there is a difference in degree because the court can look at those statements. They can look at the plain language of the agreement and see that this is simply a future claim arising out of a past event. And it's entirely proper for parties to enter into releases and settlement agreements under those circumstances, knowing that there could be claims accruing later, acquired later in some way that grow out of that event, but you're accepting consideration to release those claims. And that's what the plaintiffs did in this case. And superimposed over this entire discussion is the First Amendment. Remington did not initiate this conversation in 2010. It was the plaintiffs who willingly went on national TV to renew a discussion about the accident, about the rifle. Remington simply responded as it had a right to do and repeated the positions it publicly communicated back in 2001 about this accident. And I think this court, all courts have an obligation to give the utmost protection to the free flow of ideas and points of view and opinions and public discourse. And if Remington is somehow prevented from coming back and saying, we have a different view on what took place, these are the facts that we learned in the context of that prior lawsuit and state those facts, those First Amendment rights are chilled. And that really, I think, is something that needs to be considered separate and apart from the purely contractual issues that exist among the parties. If the court has any further questions, I'd be happy to answer them. Otherwise, the defendants request that the district court be affirmed. Thank you. I don't hear other questions, so we'll let the matter be submitted on your argument. I told Mr. Barber, his counsel, Mr. Rambler, we would give him a minute for rebuttal. I'd just simply like to address this issue of where do you draw the line or where should the court draw the line? And counsel for the defendants tried to make a distinction between future claims and future torts. And I don't think there is a distinction to be made there. I think the line to be drawn is, did the claim exist? Did the tort exist when the release was signed? This claim did not exist in 2002. It did not come into being until the statements were made. Because even though they're the same statements, they were repeated? Why is it a new tort? Because Montana has clearly adopted, has followed the restatement second of torts in a long line of cases, including the Hale case that the court specifically notes that. And it is clear under the restatement that every time you repeat a statement, it's a new tort. And the reason for that is usually articulated because it reaches a broader audience or a different audience and it creates new damage. And that is particularly true here. This statement, the statement in 2001 was a press release that Remington issued. It was not widely reported. These statements were, was a slick video presentation that was posted to a dedicated website. It's been posted to YouTube. It's still being viewed today on YouTube. This is after Barbara got the 60 minutes time? This was after the statements that are posted to YouTube and on the dedicated website are after the Remington Under Fire show in 2010. That was 60 minutes? No, that was the CNBC show in 2010 that's the subject to this. The initial statement that Remington made was simply a written statement in a press release that was not widely reported. So. Lynn, you don't challenge the argument by appellee that Remington would have a privilege to respond, a common law privilege to respond. Is it just your position that they have such a privilege, but it can't be, it can't support statements made in bad faith? The statements need to be in good faith. And we've alleged, clearly alleged actual malice in this, in this, in the pleadings in this case. The privileges too, as far as the fair reporting is also a conditional privilege. And the court should note that under Montana law, there's an absolute privilege for pleadings and statements made during litigation. That's under subsection two of that statute, subsection four, which they're claiming now is the fair and true report of a prior case, of a case that's no longer being litigated. And that's a conditional privilege. That statute, the state statute, as I read it, although it covers a fair and true report of litigation. It does. It doesn't have a general provision in it that says a party has a common law right of response to some challenge. But yet it seems that that would be recognized by, by any state that, that if someone stands up on TV and says the company's, a company is doing something wrong and harmful, that the company's got to have a privilege to respond. Your honor, I think everyone has a privilege to respond. And I think everyone has to stand up and defend themselves for the truth. And I believe that that's what the barbers are doing in this case. Thank you, your honor. A very interesting and challenging case. So Barbara versus Remington Arms shall be submitted. And we thank both counsel for a challenging argument.
judges: Kleinfeld, Gould, Christen